UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 04-149-01-SM |
| ) | |
| GREGG HOUSH ) | |

**PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, Thomas P. Colantuono, United States Attorney for the District of New Hampshire, and the defendant, Gregg Housh, and the defendant's attorney, Jeffrey D. Levin, AFD, enter into the following Plea Agreement:

1. **The Plea and The Offense**.

The defendant agrees to plead guilty to the one Count Information charging the defendant with conspiring to violate copyright laws, in violation of Title 18, United States Code, Sections 371 and 2319(b)(1), and Title 17, United States Code, Section 506(a)(1).

In exchange for the defendant's plea of guilty, the United States agrees: A) to refrain from bringing further or additional charges relating to or arising out of the conduct which forms the basis of the Information in this case; B) consistent with the provisions in paragraph 5 below, to file a motion for downward departure; and, C) to recommend the low end of the final adjusted

-1-

offense level range as ultimately found by the Court.

2. **The Statute and Elements of the Offense**.

Title 18 United States Code, Sections 371, provides, in pertinent part:

> [i]f two or more persons conspire ... to commit an offense against the United States, ..., and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.

The defendant understands that the offense to which he is pleading guilty has the following elements, each of which the government would have to prove beyond a reasonable doubt at trial:

First, that the agreement specified in the information, and not some other agreement or agreements, existed between at least two people; and

Second, that the defendant willfully joined in that agreement; and

Third, that one of the conspirators committed an overt act in an effort to further the purpose of the conspiracy.
[see FEDCRIM-JI1 § 4.03; Pattern Crim. Jury Instr. 1st Cir. § 4.03]

Title 18 United States Code, Section 2319(b)(1) provides in pertinent part:

> (b)Any person who commits an offense under

section 506(a)(1) of Title 17-
   (1) shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180 day period, at least 10 copies or phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500;

Title 17, United States Code, Section 506(a)(1) provides:

(a) Criminal Infringement.-Any person who infringes a copyright willfully either-
   (1) for purposes of commercial advantage or private financial gain, or
   (2) by the production or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which Have a total retail value of more than $1,000,
shall be punished as provided under section 2319 of Title 18, United States Code. ...

The elements of the offense of copyright infringement, in violation of Title 18 United States Code, Section 2319(b)(1) and Title 17, United States Code, Section 506(a)(1), are:

First, that a copyright exists;

Second, that it was infringed by the defendant by reproduction or distribution of the copyrighted work;

Third, the defendant acted willfully;

Fourth, the defendant infringed at least 10 copies of one or more copyrighted works with a total retail value of more than $2,500 within a 180-day period; and,

Fifth, that the defendant acted for purposes of commercial advantage or private financial gain.

[Title 18, United States Code, Section 2319(b)(1) and Title 17, United States Code, Section 506(a)(1)].

3. **Penalties**.

The defendant understands that the penalties for the offense are:

A. A maximum prison term of five (5) years;

B. A maximum fine of the greater of $250,000 (18 USC 3571(b)(3)) or not more than twice the gross gain to the defendant or twice the gross loss to any person other than the defendant (18 USC 3571(d));

C. A mandatory special assessment of $100.00 for the count of conviction which the defendant agrees to pay at or before the time of sentencing; and

D. A term of supervised release of not less than two (2) years and not more than three (3) years. The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (18 U.S.C. §3583).

4. **Sentencing**.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case.

The defendant also understands that the United States and the United States Probation Office will:

A. advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B. respond to questions from the Court;

C. correct any inaccuracies in the pre-sentence report;

D. respond to any statements made by the defendant or the defendant's counsel to a probation officer or to the Court; and

E. may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant is aware that any estimate of the probable sentence relating to the defendant that the defendant may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

5. **Substantial Assistance**

Based upon what the government has learned prior to the signing of this Plea Agreement, it has determined that the defendant has provided substantial assistance in the investigation of other persons who have committed offenses. Therefore, as long as the defendant is completely truthful, continues to cooperate fully, and refrains from illegal conduct

(except to the extent it may be specifically authorized in writing by the government) the government will file a motion pursuant to Section 5K1.1 of the Sentencing Guidelines advising the sentencing Court of all relevant facts pertaining to that determination and requesting the Court to sentence the defendant in light of the five factors set forth in Section 5K1.1(a)(1)-(5), namely:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and,

(5) the timeliness of the defendant's assistance.

The defendant agrees, accepts and understands that if, at or before the time of the defendant's sentencing, the government in its sole reasonable discretion, determines that the defendant has not been completely truthful, or has not continued to cooperate fully, or has engaged in illegal conduct (except to the extent it

may have been be specifically authorized in writing by the government), the government will not be bound to file a Motion for Downward Departure. Such reasonable refusal to file a Motion for Downward Departure by the government will not be a basis for the defendant to withdraw his guilty plea.

The defendant also understands that in the event he engages in illegal conduct (except to the extent it may have been be specifically authorized in writing by the government) after signing this Plea Agreement, the government may bring further or additional charges against him and that the bringing of any such charges will not be a basis for the defendant to withdraw his guilty plea.

The defendant also understands that the filing of a Motion for Downward Departure does not require the Court to grant or to act favorably upon the Motion. It is understood that the sentence to be imposed on the defendant remains within the sole discretion of the sentencing Court.

6. **Restitution**.

Whereas "the number of identifiable victims is so large as to make restitution impracticable", and whereas "determining complex issues of fact related to the cause or amount of the victim[s]' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process"

restitution is not an issue in this case. 18 USC 3663A(c)(3)(A)&(B).

7. **<u>Waiver of Trial Rights and Consequences of Plea</u>**.

The defendant understands that the defendant has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent the defendant. The defendant understands that the defendant has the right:

- A. to plead not guilty or to maintain that plea if it has already been made;
- B. to be tried by a jury and, at that trial, the right to the assistance of counsel;
- C. to confront and cross-examine witnesses against ~~her~~ him;
- D. not to be compelled to provide testimony that may incriminate the defendant; and
- E. to compulsory process for the attendance of witnesses to testify in the defendant's defense.

The defendant understands that by pleading guilty the defendant waives and gives up those rights and that if a plea of guilty is accepted by the Court, there will not be a trial of any kind.

The defendant understands that if the defendant pleads guilty, the Court may ask the defendant questions about the offense, and if the defendant answers those questions falsely

-8-

under oath, on the record, and in the presence of counsel, the defendant's answers may later be used against the defendant in a prosecution for perjury or making false statements.

8. **Acknowledgment of Guilt; Voluntariness of Plea**.

The defendant acknowledges that the defendant is entering into this Plea Agreement and is pleading guilty freely and voluntarily because the defendant is guilty. The defendant further acknowledges that the defendant is entering into this Plea Agreement without reliance upon any discussions between the United States and the defendant (other than those described in the Plea Agreement), without promise of benefit of any kind (other than concessions contained in the Plea Agreement), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges the defendant's understanding of the nature of the offense to which the defendant is pleading guilty, including the penalties provided by law. The defendant also acknowledges the defendant's complete satisfaction with the representation and advice received from the defendant's undersigned attorney.

9. **Scope of Agreement**.

The defendant acknowledges and understands that this Plea Agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made

to the defendant with respect to any civil or administrative consequences that may result from the defendant's plea of guilty, because such matters are solely within the discretion of the specific administrative or government agency involved. Finally, the defendant acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

10. **Collateral Consequences**.

The defendant understands that the defendant will be adjudicated guilty of the offense to which the defendant will plead guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

11. **Satisfaction of Federal Criminal Liability; Breach**.

The defendant's guilty plea, if accepted by the Court, will satisfy any federal criminal liability of the defendant in the District of New Hampshire as a result of the defendant's participation in the conduct which forms the basis of the Indictment [Information] in this case. The defendant understands that if, before sentencing, the defendant violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw from it.

12. **Waivers**.

   A.   **Appeal and Collateral Review**.

   The defendant is aware that the defendant has the right to challenge the defendant's sentence and guilty plea on direct appeal. Defendant is also aware that the defendant may, in some circumstances, be able to argue that the defendant's plea should be set aside, or the defendant's sentence be set aside or reduced, in a collateral challenge (such as pursuant to a motion under 28 U.S.C. § 2255 or § 2241).

   By entering into this Plea Agreement, the defendant knowingly and voluntarily waives any right to appeal or to collaterally challenge:

   1. The defendant's guilty plea and any other aspect of defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues;
   2. The imposition by the District Court of a sentence which does not exceed the sentence recommended by the government, even if the Court rejects one or more positions advocated by the U.S. Attorney or defendant with regard to application of minimum mandatory sentences.

   Defendant's waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges

-11-

based on new legal principles in First Circuit or Supreme Court cases decided after the date of this Plea Agreement which are held by the First Circuit or Supreme Court to have retroactive effect. Defendant's waiver of the right to collateral review does not extend to a claim of ineffectiveness of counsel.

This Plea Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the United States therefore retains its appeal rights.

### B.  **Freedom of Information and Privacy Acts.**

The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

### 13.  **No Other Promises**.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

14. **Agreement Provisions Not Severable**.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

THOMAS P. COLANTUONO
United States Attorney

Date: JUNE 22, 2005     By: _____
Arnold H. Huftalen
Assistant U.S. Attorney
Bar No. 1215
U.S. Attorney's Office
55 Pleasant St., 4th Floor
Concord, NH 03301
(603) 225-1552

The defendant, Gregg Housh, certifies that he has read this thirteen (13) page Plea Agreement and that he fully understands and accepts the terms thereof.

Date: June 24 2005     _____
Gregg Housh, Defendant

I have read and explained this thirteen (13) page Plea Agreement to the defendant, and he has advised me that he understands and accepts its terms.

Date: June 24 2005     _____
Jeffrey S. Levin, AFD
Attorney for Gregg Housh

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.                                          Cr. No. 04-149-01-M

GREGG HOUSH

## FACTUAL ADDENDUM TO PLEA AGREEMENT

In the event this case were to proceed to trial, the parties agree that the government would prove through competent evidence and beyond a reasonable doubt the following:

### General Background

This case is about an individual who conspired with others to engage in web based software piracy. Software piracy involves the illegal copying, storing and distribution of copyright protected software across the Internet through a series of FTP, or File Transfer Protocol, computer servers known as Warez sites. Warez is the word used by those involved to describe pirated software. They also refer to themselves as being in the "warez scene." The defendant, Gregg Housh, was a courier for one such warez server, known as SHAYOL GHUL. Although an exact dollar loss is impossible to ascertain due to the covert nature of the illegal piracy, Industry trade groups estimate those losses to be billions of dollars annually.

Individuals who engage in web based software piracy most often are affiliated with one or more piracy group. Some groups are more structured than others and some are recognized as being of a higher caliber, within this warez scene. Irrespective of the hierarchical position of the group, members of individual groups generally communicate with each other, in real time and for the purpose of engaging in software piracy, through private Internet Relay Chat (IRC) channels which are not open to the public and to which access is limited to invited members.

Web based software piracy is conducted, generally, as follows. Copyright protected software, whether it is a relatively inexpensive computer game, music, movie or an extremely expensive and complex application program, are manufactured and distributed with built in anti-copy protections designed to prevent unauthorized copying and transmission across the web.

In software piracy, the software is first "cracked." That is to say, an individual, or a group of individuals take the copyright protected software apart and remove any anti-copy and anti-transmission protections. And then re-assemble the software in a form

which can transmitted over the web and digitally copied with relative ease. The software is then uploaded to upper echelon warez sites. In the first instance, cracked software is almost always uploaded, or posted, to a site which is affiliated with a particular cracking group. Those sites are known as "zero day" release sites. The phrase "zero day" comes from the fact that in most instances the software is cracked and posted to the site on the very day the software is released, hence the phrase "zero day."

Once posted to a zero day release site, and the cracking group or individual responsible takes its, or his bow, so to speak, for having been the first to crack it, the software is thereafter made available for distribution to other, lower hierarchy, warez sites. This is accomplished through the use of "couriers." Couriers are merely individuals who have been authorized to access particular ware sites for the sole purpose of copying software and spreading it around to other sites to allow for more widespread distribution. These couriers have their computers set up to automatically run programs which cause the machine to search zero day sites to which access has been authorized, look for new material, and then copy that new software and distribute it to any number of other warez sites. Which other sites get software from which couriers is determined by agreement between the owners, or site operators, of those lesser sites and which ever courier or couriers they have agreements with. And so it goes, on and on until the cracked software has been posted to hundreds, if not thousands of warez sites. The lowest hierarchy sites, which are the most numerous, and if schematically drawn would be at the bottom of a pyramid with the zero day sites being at the top. Many of these low level sites, which are not involved in this case, unlike the upper and mid level sites, are open to anyone who cares to access them.

There are literally thousands of warez sites around the world, all of which serve absolutely no legitimate legal purpose. Their exclusive reason for being is to allow and facilitate the illegal copying and distribution of copyright protected software without permission of the copyright holder and without financial payment.

In December of 2000, as an outgrowth of an FBI investigation in Chicago, IL, FBI agents from the Boston Filed Office began an under cover operation (UCO), known as Digital Piratez, working with a cooperating witness (CW) who lived in New Hampshire and who was involved as a manager with a mid level Warez group. That individual had access to several mid level warez sites, including the site at issue in this case, SHAYOL GHUL (SG). The CW introduced under cover agents (UCAs) to several warez groups, via IRC chat. And the UCAs thereafter gained access to yet other mid level sites. Many of which were targeted for searches.

High volume and high traffic warez sites are typically located at large businesses, universities, or Internet Service Providers ("ISPs"), almost always without the knowledge of the owner. The location at businesses or universities is done primarily because the amount of bandwidth (or Internet connectivity) available in such institutions is large and heavy Internet traffic, which is common with warez sites, is unlikely to be noticed or detected. Not only do warez operators use, or more accurately steal, an organization's computer services including bandwidth, for an unauthorized activity, i.e. hosting a warez

site, they often steal, or convert without authority, computer equipment from their employers to satisfy the computer hardware needs of the warez site.

During this UCO, the main form of communications for the subjects, CW, and UCAs was on certain limited IRC channels, including one named #warez and another named #hawkwing. Each of these private IRC channels was established for and used by individuals who were associated with the warez server SHAYOL GHUL. Neither of these IRC channels was open to the general public.

Individuals who engage in software piracy use a number of security procedures to hide their true identity. The use "nicknames" or "nicks" and sometimes utilize a "bounce box", which is an intermediate computer connection between their originating computer and the warez site. The "bounce" works to hide their originating IP address and conceals or hides their identity. In order to limit access to these sites to authorized, although illegal, users, site operators generally employ numerous security measures. These security measures include: 1) keeping the IP address of the warez site a secret; 2) using non typical port connections. Each computer has 65,536 ports through which a connection can be made, and there are default ports for certain activities. Almost every computer made and sold is set up so that FTP traffic is received through port # 21; web traffic port #80, etc., etc. But these can be changed and in warez servers they always are. 3) the servers are set up to recognize and allow access only by users who have an account on the server; 4) authorized users must also have a pre-arranged password; and finally, 5) the servers are usually set up to accept only incoming signals which originate from certain pre-registered IP addresses. Consequently even if you know the IP address of the warez site, know someone's user account name and password, and know which non-conventional port to connect to, you won't be able to connect because your computer's originating IP address has not been pre-programmed into the warez server.

## Facts Specific to This Case

In this case, the defendant, Greg Housh was a courier for the warez server known as SHAYOL GHUL. In March and April of 2001 the owner of the site, David Foresman, communicated with an individual named Kenneth Woods, for the purpose of placing the SHAYOL GHUL server on line at Woods, place of employment; a Verio Data facility in Sterling, VA. Woods had access to and authority over computers in the facility connected to the Internet with massive bandwidth. In April of 2001 Foresman shipped the server from Illinois to Woods in Virginia and Woods place it on line at Verio Data. Woods maintained the server and in exchange was granted unlimited access to the server by the defendant. Both Foresman and Woods have plead guilty in this Court and been sentenced.

Fearing detection by his employer, Woods took the server off line in August of 2001. However, prior to the server being taken off line, with the assistance of a CW who had access to the server, the FBI had infiltrated the server and had determined that it was a viable target for seizure. But because it went off line in August, there was no fresh probable cause to use in order to obtain a search warrant at the time the searches were

conducted on December 11, 2001. Since Woods had been identified during the course of the UCO, the FBI engaged in a knock and talk with him, Woods, in December, 2001. Mr. Woods was fully cooperative, completely confessed his involvement in two non-custodial interviews, and made arrangements to retrieve the server from his employer's place of business where he had stored it, and voluntarily turned the server over to the FBI.

The defendant's role in this conspiracy was that of a "courier." Specifically, Mr. Housh created and allowed to be used in this conspiracy a computer program which ran automatically using accounts held in the defendant's name on this warez server and others. This program would cause the defendant's account to access other warez sites, search for new software recently added to those sites, make copies of any such new copyright protected software and then deliver it to and install it on the SG server. Through this process the SG server was populated with new, and current, copyright protected software on a regular, frequent basis. This courier program was run on the SG server with the defendant's knowledge and permission.

A forensic examination of the SHAYOL GHUL server has disclosed that approximately 275 individuals had authorized "user accounts" on the site and there were 17 individuals with site operator/managerial privileges and responsibilities. Additionally, the server maintained logs of all who accessed the server, noting with particularity the date, time and duration of the access; whether data was uploaded or downloaded and if so what and how much; as well as the IP address of the incoming signal.

Testimony would prove beyond a reasonable doubt that more than 10 pieces of copyright protected software with an aggregate value in excess of $2,500, between $120,000 and $200,000, was the subject, or object, of the conspiracy and was uploaded to and downloaded from the site SHAYOL GHUL during the time set forth in the Information. Testimony would also establish that the co-conspirators engaged in this conspiracy for private financial gain.

June 23, 2005

THOMAS P. COLANTUONO
United States Attorney

By: /s/ Arnold H. Huftalen

Arnold H. Huftalen
Assistant U.S. Attorney
NH Bar No. 1215
U.S. Attorney's Office
55 Pleasant St., 3rd Floor
Concord, NH 03301
(603) 225-1552 ext 218

 

The defendant, Gregg Housh, certifies that he has read this five page Factual Addendum to Plea Agreement and that he fully understands and accepts as true the factual statements contained herein.

/s/ Gregg Housh                                                    June 23, 2005
Gregg Housh
Defendant

 

I have read this five page Factual Addendum to Plea Agreement and discussed it with my client, who advises me that he understands and accepts as true the factual statements contained herein.

/s/ Jeffrey B. Levin, Esq.                                   June 23, 2005
Jeffrey B. Levin, Esq.
Counsel for Gregg Housh